IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2020

## STATE OF TENNESSEE v. JEREMY LEE FLEMING

**Appeal from the Circuit Court for Bedford County**
**No. 18610   Forest A. Durard, Jr., Judge**

_____

### No. M2019-00573-CCA-R3-CD

_____

The Defendant, Jeremy Lee Fleming, was convicted by a Bedford County Circuit Court jury of first degree premeditated murder, first degree felony murder in the perpetration of a theft or arson, arson, and theft of property valued at $1000 or more but less than $10,000. The trial court merged the first degree murder convictions and imposed a life sentence. The court sentenced the Defendant to fifteen years for arson and to twelve years for theft, as a Range III, persistent offender, and the court imposed the arson and theft sentences concurrent to each other but consecutive to the life sentence, for an effective sentence of life plus fifteen years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred in imposing consecutive sentencing. We affirm the first degree murder and arson judgments, but we modify the judgment for theft to reflect a sentence of eleven months, twenty-nine days.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in Part, Modified in Part**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Donna Hargrove, District Public Defender; and Michael J. Collins, Assistant District Public Defender, for the Appellant, Jeremy Lee Fleming.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Robert Carter, District Attorney General; Mike Randles and John Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to the death of Timothy Perkins, the burning of the home Mr. Perkins rented, and the taking of Mr. Perkins's vehicle.

At the trial, Bedford County Firefighter Robert Perry testified that on December 2, 2016, he arrived at home around 4:30 or 5:00 p.m. and that he later received a pager notification regarding a "structure fire" at an address across the street from his house. He did not recall when he received the notification. He drove to the fire and notified dispatch that he was at the scene. He said that he walked around the house to assess the fire and any hazards and that he turned off the electricity to the house. He said that when he first arrived, flames were not coming from the front of the house but that the fire had progressed, with heavy smoke coming from the front of the house, and that "the conditions on the original corner were beginning to worsen." He said the "neighbor or caretaker of the property" arrived.

Mr. Perry testified that he went to the front porch, where he saw a sheet and blood on the porch. He said the blood was on the porch near the front door. He said he saw "tracking" in the blood but could not tell if footprints existed. He later denied that he "thought it looked like tracking" and agreed he had not closely studied the blood. He thought he might have seen "personal belongings" on the porch, as well. He said that the front door opened when he hit it and that smoke came out but that he did not enter the house because other firefighters had not yet arrived. He said he wore fire gear and had not worn Nike Air Jordan shoes. He said he did not own any Nike Air Jordan shoes.

Mr. Perry testified that Bedford County Sheriff's Deputy William Castleman arrived and that he told Deputy Castleman about the sheet and the blood on the porch. Mr. Perry said Bedford County EMS Captain Bryan Bruce arrived. Mr. Perry said Mr. Bruce removed the sheet from the front porch and brought it to the yard. Mr. Perry said that as the fire progressed, the front porch roof collapsed.

Mr. Perry testified that a fire truck arrived and that he and the other firefighters began extinguishing the fire. Mr. Perry said the northeast corner of the house sustained the greatest fire damage. Mr. Perry said he never entered the house but that it appeared "pretty well burned" from the outside. He said it had been dark outside when he arrived and that he had used a flashlight when he went to the porch and door.

Bedford County EMS Captain Bryan Bruce testified that he was in his office on the evening of December 2, 2016, when he heard a dispatch regarding a "fire standby." He said EMS's role was to watch the firefighters and assist if anyone was hurt or was found injured at the scene. He said he went quickly to the scene, which was about two to three minutes from his office. He said that he arrived around the same time as Deputy Castleman

and that Mr. Perry was at the scene. Captain Bruce said the property's caretaker and "some other people" whom he did not know but were "civilians" were also present. Captain Bruce said he surveyed the scene for hazards and called out for anyone who might need assistance as he and the other emergency personnel waited for the fire truck to arrive.

Captain Bruce testified that he saw heavy, black smoke coming from the house but that the flames were contained inside the house at first. He said he went to the front porch to call to anyone inside through the door and to look for anyone inside. He said flames were starting to come outside onto the porch when he approached. He said that he did not receive any response to his calls and that he could not see anyone inside the house. He said he saw a blood-covered sheet on the porch's floor and blood on the porch and front door. He said he collected the sheet and pulled it "several steps into" the yard because he could tell the porch was about to be destroyed by the fire. He said he "turned [the sheet] over" to Deputy Castleman. He said the sheet was "grossly covered" in blood. He identified a sheet and agreed it appeared to "have the same appearance" as the sheet he recovered at the scene. The sheet was received as an exhibit.

Captain Bruce testified that, at some point, a firefighter notified him that a body had been found. Captain Bruce said that he entered the house through the front door after the fire was extinguished and that he pronounced the person deceased. He later learned the victim was Robert Timothy Perkins. He said the body was transported to the medical examiner's office for an autopsy.

Bedford County Fire Department Lieutenant Todd Carter testified that he was dispatched to the fire. He said the house sat 200 to 300 feet from Highway 231. He said small rental cottages and a "regular size double wide" were in the vicinity and that a couple of houses sat across the highway. He said he arrived around 8:00 or 9:00 p.m. He said he saw flames coming from the top of the front door and side windows and rolling across the roof when he arrived. He said he saw the most flames coming from inside the front door and at the rear of the house.

Lieutenant Carter testified that he assessed the fire and determined that they would have to go inside the house once a larger fire truck arrived. He said that he and Lieutenant Leo Wilcox later entered the burning house by crawling through the front entrance. He said the front door had collapsed by this time. He said other firefighters started fire suppression efforts from outside the house while he searched for hotspots inside. Lieutenant Carter said that after he crawled in the house, he felt what he recognized as a body on the floor. He said that when the smoke cleared, he confirmed it was a body. He said the front door had fallen on the body and that he had not felt it when he first entered. He thought he and Lieutenant Wilcox moved a portion of the door from the body. Lieutenant Carter said that an EMS worker brought him a sheet to cover the body and that

-3-

a volunteer firefighter, Ryan Pool, was posted to guard the scene near the body in order to preserve evidence.

Lieutenant Carter testified that he found the body three to four feet inside the front door and that the body was facedown with the head facing the doorway. He said the body was in "good condition" as compared with bodies he typically found in fires. He said the body was clothed in jeans and cowboy boots. He could not recall the details of the shirt but said it was well-preserved. He thought the door that fell on the body had helped preserve the body from greater damage. Lieutenant Carter said that the body had a "slice across his throat" and that the wrists and ankles were bound with thick wire ties. Lieutenant Carter said the presence of the bindings caused the authorities to view the area as a crime scene.

Lieutenant Carter testified that in his opinion, the fire had not burned for "too long," and he said the use of an accelerant would hasten the spread of a fire. He said "Bomb & Arson" investigated the fire.

Lieutenant Carter testified that he looked through the house "[m]ultiple times" and that he saw a butcher knife on the corner of the kitchen counter. He said the furniture was in disarray, as if someone had thrown around items. He said it appeared "a scuffle or something" had taken place "because it just was not right." He acknowledged that water might cause furniture to move but said that he sprayed water at the ceiling and not in a manner that would move furniture. He said he found an approximate two-gallon can containing gasoline in a bedroom closet. He said that he noticed the odor in the house of what he thought was gasoline.

Bedford County Sheriff's Deputy William Castleman testified that he received a dispatch call regarding a structure fire around 7:00 p.m. on December 2, 2016. He said that he arrived at the scene around 7:10 p.m. and that he saw a house on fire with smoke coming from the front door and fire coming from the back of the house. He said that he saw a volunteer fireman whose identity he did not know and that the fireman told him to check the front porch for blood. Deputy Castleman said that he went to the steps of the front porch but did not go onto the porch and that he observed a handprint on the door about one foot below the doorknob, a pool of blood about the size of a dinner plate inside the slightly opened door, blood specks and footprints on the porch, and a bloody sheet on the porch.

Deputy Castleman testified that he notified his supervisor, Sergeant Jimmy Rhodes, that they might have a crime scene. Deputy Castleman said that after Mr. Bruce arrived, they went to the front porch. Deputy Castleman said he wanted to get the bloody sheet from the porch but that flames were rolling out the front door. Because Deputy Castleman wore a polyester uniform, which was unsafe around fire, Mr. Bruce retrieved the sheet and

handed it to Deputy Castleman. Deputy Castleman identified a photograph of the porch he took with his cell phone, and the photograph was received as an exhibit. He said he placed the sheet in a paper bag and locked it inside his trunk. He said he later gave it to Tennessee Bureau of Investigation (TBI) Agent Zack Burkhart.

Deputy Castleman testified that after he learned a body had been found inside the house, they "taped off the crime scene." He said he kept the log of people at the scene for part of the evening. Deputy Castleman said he wore "Rocky work boots" at the scene.

Bedford County Fire Chief Mark Thomas testified that Todd Carter called him on December 2, 2016, and informed him that a body had been found inside the home where the fire took place. Chief Thomas said he notified Russell Robinson in the State Fire Marshal's Office and asked Mr. Robinson to come to the scene. Chief Thomas said the situation was one in which he would notify "State Bomb & Arson."

Chief Thomas said he and other "listed" individuals entered the burned house. He said the victim's feet were bound but did not recall if the victim's hands were bound. He said he and the county coroner, Dr. Rupert, rolled the body in order for Dr. Rupert to examine the head, which was of interest due to the pooling of blood near the head. Chief Thomas said that when the body was rolled, he noticed the odor of what he thought was gasoline. He noticed what appeared to be a bullet hole in the head of the body and "almost like a cut mark in the throat." He said he did not see a large amount of blood near the throat injury. He said they wrapped the head in cellophane to protect the evidence until the coroner arrived.

Tennessee State Fire Marshal Bomb and Arson Section Investigator Russell Robinson, an expert in the origins of fire, testified that he was contacted by Chief Thomas on December 2, 2016, regarding the fire and fatality. Investigator Robinson said that he received a dispatch around 7:06 p.m. and that he arrived around 8:00 p.m. He said he notified his supervisor, Investigator W.C. Hamm, and asked for the K-9 Unit to come to the scene. He said the K-9 Unit had dogs trained to detect the presence of accelerants. He said Investigator Zimmerman and his dog, Scooter, responded.

Investigator Russell testified that when he arrived at the scene, he spoke with Agent Burkhart, Investigator Sweeney, and unidentified Bedford County Fire Department personnel. He said Lieutenant Todd Carter told him about the fatality.

Investigator Russell testified that he prepared a written Origin and Cause Report regarding the fire in this case, and the report was received as an exhibit. Referring to his report, Investigator Russell said he classified the fire as incendiary, meaning it had been intentionally set. He said two points of origin existed: the area around the head of the bed

and floor area of the left rear bedroom and at the floor level near the front entrance to the house and near the victim's body.

Investigator Russell testified that he agreed with Lieutenant Carter's report of a gasoline-like odor. He said that photographs were made before anything was moved and before the dog went into the house to locate the odor of any accelerants. He said that after the dog searched the house, Investigator Zimmerman told him that the dog had indicated two areas which might contain accelerants. Investigator Russell said he learned from TBI agents or local detectives that a truck was missing from the driveway.

Investigator Russell testified that when collapsed siding was removed from the porch, the investigators found "red brown staining" that they suspected was blood. He said they also "noticed a potential footprint in the blood" on the porch that had been protected by the fallen siding. He said the evidence at the scene was collected by the TBI for analysis.

Investigator Russell testified that investigators found a gasoline jug in the far right bedroom. He said that adding gasoline to a fire would cause the fire to spread more quickly than it otherwise would.

Investigator Russell testified that firefighters told him a struggle appeared to have taken place in the living room and that the firefighters were emphatic that they had not knocked over the furniture while extinguishing the fire. Investigator Russell said a safe was on the rear back wall of the living room. He said that the safe was unlocked and that the door was closed but "kind of cracked open." He said the contents of the safe were in disarray and "[s]ome of the shelving was knocked off." He said the contents of the safe were "very, very small" in relation to the size of the safe, which was a metal gun safe. A photograph of the safe was received as an exhibit.

Investigator Russell identified a photograph of a camouflage jacket in the house's kitchen. He said the dog indicated the presence of an accelerant on the jacket. He identified a photograph of the gasoline can, which he said contained a "residual" amount of gasoline. The photographs were received as exhibits.

Investigator Russell testified that he observed unusual wounds on the victim's body that he thought might be from a knife or gunshot and that the investigators found a knife, which they asked Agent Burkhart to collect. Investigator Russell said two knives sat on a kitchen counter. He said a knife with a broken tip sat on a different kitchen counter near the front door. He said the investigators found cigarette lighters near the body. He said they found keys, a Ruger ammunition box, a shell casing, a cigarette butt, and an airsoft gun in the living room. An evidence log was received as an exhibit. Diagrams of the scene prepared by Investigator Russell were received as an exhibit.

Referring to the diagrams, Investigator Russell testified that a syringe and "security camera remains" were found in separate locations in the front yard. He said a cigarette lighter and six "red/brown" stains were found in various locations in the right side yard. He said a red/brown stain was found in the backyard. He agreed that Detective Sweeney found all of the items in the yard.

Investigator Russell testified that the victim's body lay on its back with the head nearest the front door. He said that if another witness said the body had been facedown, the other witness was incorrect. Investigator Russell said that the victim's hands were bound behind the victim's back and that the victim's feet were bound. Investigator Russell said that when Dr. Rupert was present, the investigators rolled the victim's body to look for wounds in addition to injuries to the neck and the side of the head. Investigator Russell said he noticed an odor that smelled like gasoline when the body was rolled. He said the odor came from under and around the victim. Investigator Russell said a large amount of what appeared to be blood was around the victim's head.

State Fire Marshal's Investigator Michael Zimmerman testified that he was the handler for Scooter, a trained dog and that he and Scooter responded to the scene in this case. He said that after he inspected outside the house for safety issues, he took Scooter into the house. He said that Scooter sat next to the remains of a bed in what was previously identified as the left back bedroom. He said that Scooter sat to indicate the possible presence of an accelerant. He described the left back bedroom as having been completely burned and having "reached the point of flashover." He said the floor in the area in which Scooter indicated the possible presence of an accelerant was burned through. He said that he took Scooter through the other rooms of the house and that Scooter indicated a second area containing the possible presence of an accelerant on a camouflage jacket or "hoodie" in the kitchen. He said Scooter did not indicate the possible presence of an accelerant when Scooter sniffed the victim's body. A photograph of the area around the clothing on which Scooter indicated the possible presence of an accelerant was received as an exhibit.

Investigator Zimmerman testified that the victim's body was "burnt" and that after other investigators rolled the body, he saw the victim's hands were bound behind the victim's back and smelled the odor of gasoline coming from underneath the body. When asked why Scooter might not have indicated the possible presence of an accelerant when she sniffed the victim's body, Investigator Zimmerman said that she was trained to work toward the source of an odor and that the odor from the camouflage jacket may have been stronger than any odor from the body.

Joy Vail-Allman testified that she and her husband owned several rental properties near their farm, including the house involved in the fire in this case. She said the victim was her tenant on December 2, 2016. She said she was out of town on the date of the fire but that her son called to tell her about the fire and the discovery of the deceased victim

inside the house. She said that there had been no mortgage on the property and that she did not give anyone permission to set the fire. She said the victim had been an excellent tenant.

Timothy Cox testified that he was one of Ms. Allman's tenants in December 2016 and that he lived near the victim's house. He said Ms. Allman had a caretaker for her rental properties whose name he did not remember. Mr. Cox said the caretaker was the first person he saw at the fire. Mr. Cox said the victim had a brownish-yellow dog that he thought was a hunting dog. Mr. Cox said the victim had a "good looking . . . gray Ford truck."

Mr. Cox testified that on the night of the fire, he was at home after work with his daughter, who was age ten at the time. Mr. Cox said that when he drove into his driveway after work around 3:30 or 4:00 p.m., he saw a small car parked "before" the entrance to his driveway. He said two white men whom he did not know were inside the car. He said that his daughter and her friends were playing outside and that he was concerned about the men being nearby. He said he stared at the men for a while before he went inside. He said he never saw anyone get out of or into the car. He said that he went inside to eat, that he looked outside after fifteen to twenty minutes and saw the car and the men were still there, and that he went outside to his garage near where the children were playing.

Mr. Cox testified that after about fifteen to twenty minutes from his going to the garage, his daughter came into the garage and asked him if he smelled smoke. He said he told her someone was probably burning leaves. He said that she left and came back quickly and that she stated, "Daddy, the trailer next door is on fire[.]" He said he walked outside, saw the fire, saw "Ben," a neighbor, pull up and run to the burning house, and saw a male neighbor from across the street who he thought was "part of the fire department" arrive. Mr. Cox said the neighbor and Ben beat on the door or tried to open the door of the burning house. Mr. Cox said he and his daughter stood on the "other side of the yard" and watched the house burn. He said that the smoke was thick and that the heat melted the siding on his house. He said that when his daughter got his attention about the fire, the car and the two men he had seen earlier were gone. He said he had not seen them leave.

Mr. Cox's daughter testified that she was currently twelve years old and in the sixth grade. She agreed that she had been age ten in 2016. She said that in 2016, she lived with her father, grandmother, and two sisters in a house on Highway 231. She said she knew the victim on sight but did not know him well. She agreed he had a dog and said the victim drove a truck.

Regarding the day of the fire, Mr. Cox's daughter testified that she played with her best friend after they arrived home from school around 3:30 p.m. Mr. Cox's daughter said she saw the victim and his dog come home shortly after she got home, which she agreed

was before dark. She said she saw a dark green car parked "[b]etween the trees" that were between her house and the road. She said she saw the car within a few mintutes after she arrived at home. She said that her father came home around 4:30 p.m. and that the green car was parked between the trees before he arrived. She said she saw five people in the car and that three got out and walked to the victim's house. She said they wore "black pants and really dark hoodies" with the hoods pulled over their heads. She said she and her friend ran to the side of her house and went inside when the people walked past her house. She agreed that her father was home at this point. She said she and her friend went inside around 5:00 p.m. She said that at some point, her friend left to go home because the friend was scared. Mr. Cox's daughter said that as she watched a YouTube video on her computer, she heard a gunshot around 6:00 p.m. She said that she asked her grandmother if her grandmother heard the noise but that her grandmother said no. Mr. Cox's daughter said she returned to using her computer until she smelled smoke. She said that she went to ask if her father knew if anyone was having a bonfire and that he said, "I don't know." She said she went outside and saw smoke rising from the neighbor's house.

When shown a photograph of a car, Mr. Cox's daughter agreed she had previously identified the car to Agent Burkhart as the one she saw outside her house on the date of the fire. She said she did not see the car leave.

Bedford County Sheriff's Investigator John Sweeney testified that Lieutenant Jason Kennedy called him to come to the scene of the fire around 7:00 p.m. on December 2, 2016. Investigator Sweeney said that several other fire, medical, and law enforcement personnel were present when he arrived and that the TBI was called to assist later that evening.

Investigator Sweeney testified that the burned house was a total loss. He said the victim's body had been damaged by the fire and that the victim had other injuries including a bullet hole behind one of the ears and some cuts. Investigator Sweeney said he saw a large amount of blood.

Investigator Sweeney testified that he searched for evidence in the victim's yard. He said he found a syringe, which was collected as evidence. The syringe, a photograph of the syringe in the location in which it was found, and a photograph depicting the location of the syringe in relation to the house were received as exhibits. Investigator Sweeney said he found a camera hood or shield in the yard. He said that the investigators found evidence of a surveillance system inside the house but that no camera was recovered. A photograph of the camera shield was received as an exhibit. Investigator Swiney said a cigarette lighter was found in the yard. A photograph of the lighter was received as an exhibit.

Investigator Sweeney testified that he noticed small drops of a reddish-brown substance that looked like blood in multiple locations in the yard. He said he or Agent Burkhart collected samples from the drops. He identified photographs depicting markers

-9-

where evidentiary items were located in the yard, and the photographs were received as exhibits. The photographs depicted the markers in a trail pattern extending between the side and rear of the house.

Investigator Sweeney testified that he had thought it was unusual that the victim did not have a vehicle at the house and agreed he had thought a vehicle might be missing in connection with the fire and death of the victim. He agreed the investigators learned from interviewing the Cox family that a dark green car might be of interest to the investigation. Investigator Sweeney said that during the night, he and Agent Burkhart sat in Investigator Sweeney's truck parked on the edge of Highway 231 waiting for the crime scene investigators and for dawn. Investigator Sweeney said that while he and Agent Burkhart sat in the truck, they saw a dark green car drive toward them and then make a U-turn and head "back toward Rutherford County." He said they followed the car but never stopped it because in the process of looking for it, they saw the victim's truck parked on the side of Highway 231. He said the truck was two to five miles from the victim's house, near the Rutherford County line. He said they saw a dog inside the truck and what appeared to be blood on the outside of the truck. He said the right front tire was flat and a ladder was in the bed of the truck. He said the other front tire might have been flat. He identified photographs of the truck, which were received as exhibits. He said the apparent blood stains were collected as evidence, using the same method as was used to collect the drops of apparent blood in the yard at the house. He said that after the evidence was collected, the truck was towed to "the EMA Building" and later to the TBI Laboratory.

Investigator Sweeney testified that he and Lieutenant Jason Kennedy went to Jereisse Fleming's house on December 7, 2016. Investigator Sweeney said Ms. Fleming was the Defendant's and Myron Fleming's aunt. Other evidence showed that the Defendant and Myron Fleming were brothers. Investigator Sweeney said other law enforcement officers had been to Ms. Fleming's house a day or two earlier. He said Ms. Fleming permitted him and Lieutenant Kennedy to search the house, including a bedroom "associated with" the Defendant. Investigator Sweeney thought the room had two beds. He said he and Lieutenant Kennedy collected ATM receipts, which were in a trash can in the bedroom. He identified two pieces of paper as the ATM receipts, which he said were from Pinnacle Bank, and were received as exhibits. He said the receipts were dated December 2, 2016, and that the time stamps were 23:19:33 and 23:20:34. He said that the last four digits of the account associated with the receipts were 0146 and that both transactions took place at 123 Cason Lane in Murfreesboro. He said the receipts bore sequential numbers, meaning the transactions occurred one right after the other. He said the receipts indicated that both transactions had been unsuccessful because they stated, "withdrawal from checking, unauthorized use."

Investigator Sweeney testified that he, Agent Burkhart, Special Agent Russ Winkler, and Special Agent Josh Savley went to Florida on December 8, 2016, after

-10-

learning that the Defendant, Myron Fleming, and Autumn Slade were in Florida. Investigator Sweeney said he was present for and participated in Agent Burkhart's interview of the Defendant in Florida. Investigator Sweeney agreed that Sumter County, Florida Sheriff's Department had possession of a green Honda Accord in its evidence bay. He agreed that the car was searched pursuant to a search warrant by a Sumter County deputy. He agreed that the car was full of items and appeared as if someone were "living out of" it. He said the car and its contents, which had been collected as evidence, were returned to Tennessee. He said the car contained Nike Shock shoes but no Nike Air Jordan shoes, a couple of knives, and thirteen or fourteen "devices," which included ten or eleven cell phones.

TBI Agent Zachary Burkhart testified that on December 2, 2016, Lieutenant Kennedy called him for assistance in investigating a suspicious death. Agent Burkhart testified that he went to the scene of the house fire. He said that he and Detective Sweeney were in charge of processing the scene and collecting evidence. Agent Burkhart said he obtained a search warrant before entering the house. He said that when he returned from obtaining the warrant, Detective Sweeney notified him of the suspected blood drops "going around the side of the house." Agent Burkhart said that the house was "[v]ery dark and charred" when he entered and that he saw the victim's body near the front door. Agent Burkhart said that the victim was face up on the floor and that Agent Burkhart smelled an odor like gasoline when the investigators rolled the victim's body. Agent Burkhart said that when the victim's body was rolled, Agent Burkhart saw bright green duct tape around the victim's hands. Agent Burkhart identified a photograph of the victim's body showing the bound hands, and the photograph was received as an exhibit. Agent Burkhart said the victim wore cowboy boots, which were bound together with a zip tie and duct tape. He agreed that the duct tape on the victim's ankles was charred and discolored.

Agent Burkhart testified that the victim had a one to two inch cut on his neck near his Adam's apple. Agent Burkhart said that the body was charred to an extent that facial recognition would not have been possible for someone who knew the victim.

Agent Burkhart testified that a large, unlocked safe sat in the house's living room. He said that the safe's door was slightly open and that its contents were disheveled and fire damaged. He agreed that vinyl siding had burned and fallen onto the front porch. He identified a photograph of the porch and the burned siding, which was received as an exhibit. He said that after the siding was removed from the porch, the investigators found bloody shoe prints. He said that Special Agent Miranda Gaddes of the TBI Crime Scene Response Unit was called to process the bloody shoe prints on December 3, 2016. Agent Burkhart said Agent Gaddes identified footprints as having been made by two pairs of "Jordan" shoes. He identified photographs of the house, which were received as exhibits.

-11-

Agent Burkhart testified that he found a nine-millimeter cartridge casing and an airsoft gun in the living room. He said a gas can was collected from the right bedroom. He said two knives were collected from a kitchen counter. He said that several knives were found in the house. He said a knife with a broken tip was found on a kitchen counter near the front door. He said the investigators collected a cigarette butt from the living room because it might contain DNA evidence. He said a DVR which "appeared to be a DVR you would hook up to a monitor . . . for a surveillance system" was found in the living room. He said the DVR was not connected and was not functional when it was found. He said they collected a black Samsung cell phone in the living room. He said the TBI Violent Crime Response Team came later and collected additional evidence.

Agent Burkhart identified a photograph of the victim showing the victim's cowboy boots and hand and ankle bindings and photographs of bloody shoe prints on the victim's porch. The photographs were received as exhibits.

Agent Burkhart testified that his research showed the value of the victim's truck, a 2005 Chevrolet Silverado, was $3986 to $7073. He said the investigators received information from the victim's ex-wife about a tattoo on the top of the victim's right arm. He said the victim was identified by the tattoo. Agent Burkhart said he learned during the investigation that the victim's girlfriend at the time of his death was Amber Abrams.[1] He said Ms. Abrams identified John Paul Rowe and Chasity Smith as two of the victim's friends. He said that Mr. Rowe and Ms. Smith were interviewed and mentioned Myron Fleming's and the Defendant's names. Agent Burkhart said the Defendant was identified as being the victim's driver. Agent Burkhart said that investigators went to Ms. Fleming's house on December 5, 2016, and learned that Myron Fleming and the Defendant had been staying there but had left on December 3. Agent Burkhart said he spoke with Samantha McBride, a friend of Myron Fleming or the Defendant, on December 6.

Agent Burkhart testified that he subpoenaed the victim's Pinnacle Bank records after learning that the victim had money from the sale of a house. He said the bank records showed a transaction at 7:30 p.m. on December 2, 2016, which was after the first responders were called to the house fire, meaning the transaction took place after the victim's death. He said the transaction occurred at Capital Bank on Cason Lane in Murfreesboro. He said a second transaction on the victim's bank account occurred at approximately 11:20 p.m. at Pinnacle Bank on Cason Lane in Murfreesboro, which he said was "[n]ot very far from" Capital Bank. He said this transaction corresponded with one of the ATM receipts recovered from Ms. Fleming's house. He said another transaction on the victim's bank account occurred shortly after 11:20 p.m., again at Pinnacle Bank on Cason Lane. He said Ms. Fleming's house was about one-half mile from the two banks on Cason

---

[1] Other evidence showed that this person's name was Amber Abrahams.

Lane.  He agreed that he obtained a computer tablet and cell phones from Ms. Fleming, which were later subjected to forensic analysis.

Agent Burkhart testified that he obtained still photographs from Zach Evans, a security department employee of Pinnacle Bank, and that he later obtained video surveillance footage from Pinnacle Bank.  Agent Burkhart said he contacted John Znachio, a security department employee of Capital Bank, who provided still photographs of the transaction at the Capital Bank ATM.  Agent Burkhart identified the banks' respective locations on an aerial photograph, which was received as an exhibit.  He said he obtained video surveillance footage from Target and TJ Maxx stores three or four miles from the banks.

Agent Burkhart identified photographs he obtained from Capital Bank.  He said that the photographs depicted a white male using the ATM and that he recognized the individual as the Defendant.  The photographs were received as exhibits.  Agent Burkhart identified a photograph he received from Pinnacle Bank for the ATM transaction at 23:19:12 on December 2, 2016, which he said depicted the Defendant.  The photograph was received as an exhibit.

Agent Burkhart identified video surveillance footage of a Pinnace Bank ATM transaction from November 26, 2016 at 16:53.  He said the video showed the victim's truck coming through the ATM backward, the victim getting out of the truck and using the ATM, and the Defendant driving the truck.  Agent Burkhart identified video surveillance footage of a Pinnacle Bank ATM transaction from November 26, 2016 at 11:17.  He said the footage showed the Defendant driving the unidentified vehicle backward through the ATM lane.  Agent Burkhart identified video surveillance footage from Pinnacle Bank on November 28, 2016 at 12:49, which he said depicted the victim coming into the bank to withdraw cash and "switch a bank account."  Agent Burkhart said this footage did not depict the Defendant.

Agent Burkhart identified December 1, 2016 video surveillance footage from Ms. Fleming's house and a neighboring house.  He said the footage depicted the victim and Chasity Smith arriving at Ms. Fleming's house at 4:25 p.m.  He said the footage showed Myron Fleming coming out of Ms. Fleming's garage and the victim "[g]rabbing his ladder."  Agent Burkhart said Ms. Smith went inside the Fleming house and came outside a few minutes later.  He said that the footage showed only Myron Fleming in the garage with the victim and that the footage showed the victim's truck leave the Fleming house.

Agent Burkhart identified video surveillance footage from inside a Pinnacle Bank branch in Donelson from December 2, 2016 at 4:11 p.m.  He said the footage showed the victim and did not show the Defendant, and he agreed that the footage showed the victim "taking something and puts his glasses back on and leaves."  Agent Burkhart said bank

records and video surveillance footage showed the victim withdrew $2500 on December 2.

Agent Burkhart identified video surveillance footage from Ms. Fleming's house which he said showed the Defendant leaving Ms. Fleming's house in a green car at 3:34 p.m. on December 2, 2016. Agent Burkhart said the Defendant wore a black jacket, a red shirt, pants, and "what appear[ed] to be Jordan shoes." Agent Burkhart identified video surveillance footage which he said showed Myron Fleming's 1993 green Honda Accord in the Murfreesboro parking lot outside TJ Maxx and Target on December 2, 2016, at about 3:45 p.m. Agent Burkhart said the footage showed Myron Fleming enter Target at 3:45 p.m. and leave at 3:52 p.m. Agent Burkhart said the footage showed the Defendant enter TJ Maxx at 3:44 p.m. and leave at 3:57 p.m. Referring to footage from inside TJ Maxx, Agent Burkhart said the Defendant wore a red shirt, black jacket, and what appeared to be Jordan shoes. Agent Burkhart acknowledged that the Defendant's jacket did not appear to have a hood. Agent Burkhart said footage showed the green car leaving the parking lot at 3:58 p.m.

Agent Burkhart identified video surveillance footage from Capital Bank at 11:18 p.m. on December 2, 2016. He said it showed the Defendant wearing a white zip-up jacket with a hoodie over his head and a blue beanie. Agent Burkhart identified video surveillance footage from Ms. Fleming's neighbor's house, which he said showed three people, one of whom was the Defendant, enter Ms. Fleming's house at 11:30 p.m. Agent Burkhart said the Defendant wore a blue beanie, a shirt with an emblem on the back, and blue jeans. Agent Burkart said Autumn Slade, who was Myron Fleming's girlfriend, was one of the individuals shown. Other evidence showed that Myron Fleming was the third individual.

Agent Burkhart identified video surveillance footage from Ms. Fleming's neighbor's house from December 3, 2016. He said it showed a green Honda Accord arriving at Ms. Fleming's house and Ms. Fleming coming out of the garage. Agent Burkhart agreed that "they" interacted briefly and that Ms. Fleming left to walk her dog. Agent Fleming said footage from inside Ms. Fleming's garage showed "they" got into the car with Ms. Slade and left. Agent Burkhart said these portions of footage were from 8:33 a.m. on December 3. An electronic media storage device containing the video surveillance footage was received as an exhibit.

Agent Burkhart testified that forensic analysis of the devices he obtained from Ms. Fleming included telephone numbers and Facebook information for the Defendant and Myron Fleming. Agent Burkhart said Myron Fleming's Facebook Messenger account contained a photograph of a white Jordan shoe with a black sole. Agent Burkhart said the Defendant's Facebook Messenger account likewise contained a photograph of a "mostly black" Jordan shoe with a green handkerchief or bandana. Agent Burkhart acknowledged that he did not know if either man owned the shoes in the photographs and that he did not

know the sizes of the shoes in the photographs. Agent Burkhart said both Facebook Messenger posts were dated December 2, 2016. He said the Defendant's Facebook Messenger account contained a December 3, 2016 post which stated, "So I got $2,500, a legit car, my brother, a couple of firearms, and a few bags clothes [sic]. I just crossed the GA line. We are on 75 South, I'm ready to get on with my life."

Regarding the December 8, 2016 interview of the Defendant in Sumter County, Florida, Agent Burkhart testified that Investigator Sweeney advised the Defendant of his *Miranda* rights and that the Defendant waived his rights and agreed to the interview. Agent Burkhart said the interview lasted almost eight hours. He said they advised the Defendant that they were investigating a homicide but did not identify the victim. Agent Burkhart described the Defendant as "a little taken aback" and in "a lot of psychological discomfort." Agent Burkhart said they asked the Defendant about work, that the Defendant did not say he had worked for the victim, and that the Defendant claimed to have been working in construction for "Steve." Agent Burkhart said they talked to the Defendant about people with whom the Defendant had associated in Tennessee. Agent Burkhart said that he eventually showed the Defendant a photograph of the victim and that the Defendant's response "was something along the lines of you are not going to show me a dead person or a dead body or something like that." Agent Burkhart said the Defendant stated that he knew the victim because the Defendant "had done . . . a tattoo on him" related to the victim's son and that the Defendant and the victim had a disagreement about how the tattoo should look. Agent Burkhart said that, at this point or shortly thereafter, the Defendant mentioned he had worked for the victim. Agent Burkhart said the Defendant stated he "didn't know exactly where" the victim lived. Agent Burkhart agreed he knew that the Defendant had been to the victim's house and that he had not disclosed this information to the Defendant, as well as information about the relationship between the Defendant and the victim, in order to assess whether the Defendant was "going to be up front and talk about" the information already obtained in the investigation and to gauge the Defendant's truthfulness. Agent Burkhart described the Defendant as "very hesitant to talk about anything related to" the victim and agreed the Defendant seemed to try to distance himself from the victim. Agent Burkhart said the Defendant eventually stated that he had given the victim a chest tattoo at the victim's house and that the tattoo had taken "a lengthy amount of time." Agent Burkhart thought the Defendant stated he had been paid for the tattoo, but Agent Burkhart did not recall the amount. Agent Burkhart thought the Defendant stated he drove for the victim for "a day."

Agent Burkhart testified that, during the interview, the Defendant stated that he met John Paul Rowe through the victim and that he met the victim "through doing the tattoo." Agent Burkhart stated that the investigators had spoken with Mr. Rowe before they interviewed the Defendant and that they knew at the time of the interview that the Defendant, the victim, and Mr. Rowe spent time together.

-15-

Agent Burkhart testified that he knew about the Jordan shoeprints at the scene from Agent Gaddes but that he did not know about the Facebook Messenger posts containing photographs of Jordan shoes at the time of the Defendant's interview in Florida. Agent Burkhart said he told the Defendant that he was a "shoe guy," that they discussed shoes they wore when they were younger, and that they had a long conversation about shoes. Agent Burkhart said the Defendant stated he wore size ten. Agent Burkhart said that the Defendant had worn white Nike Air Jordan shoes when the Defendant was arrested, that the Defendant stated the shoes were his, and that Agent Burkhart took possession of the shoes from a Florida officer. Agent Burkhart said the shoes the Defendant wore at the time of the arrest were similar to Myron Fleming's Facebook Messenger photograph of Jordan shoes. Agent Burkhart described Air Jordans as "a common, expensive brand."

Agent Burkhart testified that he eventually told the Defendant "exactly why [he was] talking to" the Defendant. Agent Burkhart said the Defendant "was taken aback." Agent Burkhart agreed that the Defendant said, "[H]ey man, I didn't kill anyone," repeatedly during the interview. Agent Burkhart said the Defendant's statement about having worked for the victim was made after the discussion of shoes. Agent Burkhart agreed that the Defendant asked if the victim were the person who was dead.

Agent Burkhart agreed that he asked the Defendant about an incident at the victim's house in which the victim thought "a girl" had taken $50. Agent Burkhart said the Defendant stated he told the victim "just don't worry about it" and to take the money from the Defendant's paycheck. Agent Burkhart agreed that this occurred before the victim went to Ms. Fleming's house to get a ladder.

Agent Burkhart testified that he asked the Defendant about the photographs of the Defendant at the bank. Agent Burkhart stated that the Defendant said the victim "would give his card [sic]." Agent Burkhart said that near the end of the interview, he revealed to the Defendant that the photographs were taken after the victim's death. Agent Burkhart said the Defendant stated that the victim gave the card to the Defendant "because he worked for him" and that the victim gave the Defendant the card but not the PIN because the card worked without the PIN. Agent Burkhart agreed the Defendant stated he had given the card back to the victim at some point.

Agent Burkhart testified that at the time of the interview, the Defendant had scratches on his hands, possibly on the inner palm. Agent Burkhart said the Defendant's hands were "kind of beat up." Agent Burkhart said the Defendant's hands showed signs of healing but probably had bled at one time. Agent Burkhart thought the Defendant had bruising but could not recall where.

Agent Burkhart identified a photograph of a 1993 green Honda Accord at Ms. Fleming's house. He said he obtained the photograph from Ms. Fleming's home security

system. He said that he showed the photograph to Mr. Cox's daughter and that she identified the car as the one she saw near her house on December 2, 2016.

Agent Burkhart acknowledged that the forensic analysis of the Defendant's Air Jordan shoes revealed the Defendant's blood "but nothing else." He agreed the forensic analysis did not find the victim's blood on the shoes.

Agent Burkhart agreed that the Defendant's and Myron Fleming's cell phones were analyzed for location data and that Myron Fleming's cell phone was near the victim's house around the time of the homicide. When asked if the analysis showed that the Defendant's cell phone was not near the victim's house at the time of the homicide, Agent Burkhart said, "I do not know that," and stated he would defer to the cell phone expert who analyzed the Defendant's cell phone. Agent Burkhart agreed that the Defendant had Verizon cell phone service. Agent Burkhart said that he had sent a "preservation letter" to Verizon but that he had no information regarding the location of the Defendant's cell phone on the night of December 2, 2016 because it had not used a Verizon tower.

Agent Burkhart agreed that the victim's and Myron Fleming's blood were intermingled in samples collected from Myron Fleming's car after it was recovered in Florida. Agent Burkhart did not think the Defendant's blood was found intermingled with the victim's blood in any samples collected from Myron Fleming's car.

Agent Burkhart agreed that, based upon the video surveillance footage from the evening of December 2, 2016, the Defendant changed clothes at least three times within six hours and that the Defendant changed clothes an additional time before he went to Ms. Fleming's house after going to the ATMs.

First Tennessee Bank Senior Corporate Investigator Timothy Ramsey testified that First Tennessee Bank acquired Capital Bank in December 2017. He said that John Znachio had been employed by Capital Bank and later First Tennessee Bank but had recently retired. Mr. Ramsey said he had reviewed information Mr. Znachio provided to the TBI regarding the present case.

Mr. Ramsey testified that the former Capital Bank branch on Cason Lane, which had been closed after being acquired by First Tennessee Bank, had security cameras, which were predominantly motion activated. Mr. Ramsey said Mr. Znachio provided law enforcement with photographs or video surveillance footage from December 2, 2016 at approximately 7:27 until 7:31 p.m. Mr. Ramsey identified still images from the surveillance footage recorded when the victim's credit card was used to access the Capital Bank ATM on Cason Lane, and the images were received as exhibits.

Pinnacle Bank IT support employee Zach Evans testified that he identified security footage relevant to this case, which he provided to the TBI. He identified four surveillance footage videos, which corresponded to transactions on November 26, 2016, at 4:53 p.m. from an unidentified Pinnacle Bank branch, November 27 at 11:17 a.m. at the Church Street branch, November 28 at 12:49 p.m. at the Church Street branch, and December 2 at 4:11 p.m. at an unidentified branch. The videos were played for the jury.

Regarding ATM receipts he was provided, Mr. Evans testified that they corresponded with attempted withdrawals from a checking account at the Cason Lane branch on December 2, 2016, at 23:19 and 23:20. He said the receipts had sequential sequence numbers, meaning that the person performing the transactions "put the card in and tried and took the card out and put the card back in and tried again." He identified video surveillance footage from the transactions, which was played for the jury. A disc containing the Pinnacle Bank surveillance footage was received as an exhibit. He agreed that the person depicted in the December 2, 2106 footage from 23:18 and 23:20 wore a jacket which appeared to be light colored, but he stated that the ATM's lighting might affect the color depicted on the footage.

Pinnacle Bank Financial Specialist Karla Kennedy testified that, in November and December 2016, her job duties involved teller transactions and customer service at the South Church Street branch in Murfreesboro. She said she knew the victim, who was a regular customer. She said that the victim usually drove himself through her drive-through lane and that a few weeks before the victim's death, the Defendant began driving for the victim. She said she saw the Defendant driving for the victim two or three times. She said the victim had a Chevrolet truck which was possibly a Silverado.

Ms. Kennedy testified that, at some point, the victim came inside the branch and wanted to cash a check for approximately $37,000. She said bank policy required the check to be deposited and funds not to be released until the check cleared. She said the victim became irate and left. She said the victim went outside to the passenger side of his truck "as if he [were] getting something out of the glove compartment." She said the Defendant was in the truck. She said that the victim returned, that he was still upset, that he went to another bank, and that he returned to her branch about one hour later and deposited the check, although she did not handle the transaction when he returned. She identified surveillance footage of the victim making the deposit with Barbara Austin, a bank employee, and the footage was played for the jury.

Ms. Kennedy testified that, on a date she did not recall, the victim came to the bank and "wanted to change his account" because "[s]omeone had his . . . financial information" but that she did not help him on that occasion. She said the Defendant drove the victim to the bank on this date.

-18-

Pinnacle Bank employee Barbara Austin testified that, in December 2016, she supervised the tellers in the Murfreesboro branches and that she worked at the South Church Street branch. Regarding bank records previously provided to law enforcement, Ms. Austin testified that the victim deposited $37,586.87 and withdrew $200 on November 16, 2016. She said she handled the transactions. She said the victim had wanted the entire amount in cash but that bank policy was to release no more than $200 immediately with a large deposit by check from another financial institution. She said she told the victim, who was angry, to go to the other bank to cash the check. She said the victim returned later, was still angry, made the deposit, and received $200.

Ms. Austin identified a document containing the victim's account history from November 7 until December 4, 2016, and the document was received as an exhibit. She said three ATM withdrawals were made from the victim's account on November 26, which included one for $100. She said one $100 and two $200 ATM withdrawals were made from the victim's account on November 27. She said a $13,000 withdrawal was made from the account on November 28. She recalled assisting the victim inside the bank's lobby with the November 28 withdrawal and said he wanted to close his account and open a new one. She said she transferred $18,309.41 from the victim's existing account to a new account. She identified a document from the $13,000 withdrawal, and the document was received as an exhibit. She identified November 28 video surveillance footage of herself and the victim in the bank lobby, which was played for the jury.

Ms. Austin identified documents containing the victim's bank account records for the account he opened on November 28, 2016. She said two of the documents showed a $2500 withdrawal made by the victim at the Donelson branch on December 2, 2016. She identified a document containing a summary of the victim's ATM transactions from December 1 until December 4, 2016, and the document was received as an exhibit. She said a December 2 transaction at 7:30 p.m. "did not go through" because of an "[i]ncorrect pin." She said the attempted withdrawal had been for $400 with an additional fee because the attempt had been made at a financial institution other than Pinnacle Bank.

Ms. Austin identified the victim's Pinnacle Bank credit card statement, which was received as an exhibit. She identified ATM receipts, which had previously been received as exhibits. She said the receipts reflected that the last four digits of the account number for the transactions matched the last four digits of the victim's credit card account.

When shown video surveillance footage from December 2, 2016 at 4:11 p.m., Ms. Austin testified that she did not recognize the bank branch where the footage was filmed but that she recognized the victim.

Orange County, Florida Sheriff's Deputy Justin Van Schoonhoven testified that in December 2016, he was a crime scene investigator for the Sumter County Sheriff. He said

that on December 9, he processed a green Honda with Tennessee registration. He agreed the car had been located in Sumter County two days earlier. He said the Defendant had driven into a law enforcement officer's back yard and become stuck, that the officer's wife had notified law enforcement, and that Autumn Slade had been the Defendant's passenger. Deputy Van Schoonhoven said the car had been towed to the Sumter County Sheriff's Crime Laboratory. He agreed that Sumter authorities learned that the Defendant and other individuals and the green Honda were of interest to Tennessee authorities. He identified photographs of the car stuck in the yard and of the car, after the sunroof and other openings were sealed, and during the execution of a search warrant at the crime laboratory. The photographs were received as exhibits.

Deputy Van Schoonhoven testified that a prescription slip for diazepam bearing the victim's name and dated December 1, 2016 was found in the car. Deputy Van Schoonhoven said the prescription slip had a red stain on the top right corner. He said the back of the slip had two stains. The prescription slip and photographs of the stains were received as exhibits. He said a field test of the stain was presumptively positive for blood. He said that in order to avoid cross-contamination, he separately swabbed each of the three stains for further testing.

Deputy Van Schoonhoven testified that he found six capped hypodermic needles in the seal of the Honda's sunroof. Referring to a photograph, he said it depicted a hypodermic needle and what might be a small baggie containing residue. Photographs of the needles were received as exhibits. He said he found a blue beanie on the front, passenger floorboard. Photographs of the beanie were received as exhibits. When shown a previously admitted photograph of an individual making an ATM transaction on December 2, 2016, ending at 23:19, Deputy Van Schoonhoven said the beanie he found appeared to be the same as the one worn by the person in the photograph. Deputy Van Schoonhoven said that he found documents, two iPhones, a flashlight, hand sanitizer, "a spray," and two prescription slips bearing the victim's name in the glove box. Photographs of the glove box's contents, including the front and back of the prescription slips, were received as exhibits. Prescription slips for Ambien and Percocet, both of which were dated December 1, 2016, and which bore the victim's name, were received as exhibits. Deputy Van Schoonhoven said that these prescription slips contained stains which tested presumptively positive to be blood and that he collected samples for further testing. He identified photographs of the contents of the backseat of the car, which were received as exhibits. He said he found a "needle cap with a small green plastic baggie stuffed inside," a smoked cigarette, an unsmoked cigarette, and a cigarette lighter in the rear passenger seat. He said the baggie contained white residue, which tested presumptively positive for being cocaine when he conducted a field test.

Deputy Van Schoonhoven testified that he examined the contents of a purple suitcase from the backseat of the Honda. He said that the suitcase was full and that the

contents included a package of white and black zip ties. He agreed that the car's trunk was "very full of items" and said it appeared as if someone were "living out of" the car. A photograph of the car's trunk was received as an exhibit. Deputy Van Schoonhoven said he found multiple stains throughout the car he suspected were blood, which he swabbed for forensic examination.

TBI Technical Services Unit Special Agent Andrew Vallee, an expert in communications analysis, mapping cellular forensics, and law enforcement use of communication records, testified that some cell phone providers owned their towers, which they used for routing calls. He said that other providers, such as prepaid "Tracphone" providers, purchased data and minutes from larger companies that owned networks and towers. He said a Tracphone user might utilize the network of different carriers from one day to the next. He said that different providers captured different information regarding a cell phone user's location and movement and the content and the type of data used. He said that a call might not always be routed through the closest cell tower.

Agent Vallee testified that he examined cell phone records for the Defendant, Myron Fleming, and the victim. He identified a map of the area near the victim's house, Ms. Fleming's house, the location where the victim's truck was recovered, and commercial locations in Murfreesboro which included Capital Bank, Pinnacle Bank, TJ Maxx, and Target. The map also showed the location of AT&T cell towers.

Agent Vallee testified that the victim had cellular service through AT&T, that the Defendant had a Tracphone, and that Myron Fleming had a prepaid AT&T Go phone. Agent Vallee said Myron Fleming's prepaid AT&T cell phone number was "valid" through December 2, 2016 and that Myron Fleming established service with a different number through Sprint on December 3, 2016.

Agent Vallee testified that on December 2, 2016 at 3:44 p.m., Myron Fleming's cell phone registered in the sector where Target was located. Agent Vallee agreed that if cellular mapping showed Myron Fleming located at Target, it did not necessarily mean that he was at Target but, instead, meant he was in the sector where Target was located. Agent Vallee agreed that video surveillance footage placed Myron Fleming at Target at the same time as the cell phone data indicated Myron Fleming had been in the sector.

Agent Vallee testified that data for the victim's cell phone indicated the victim was at home from 5:43 until 6:48 p.m. and that the victim's cell phone "went off line" at 6:48. Agent Vallee said this indicated the victim's cell phone had been turned off, was no longer connected to the network, or had been destroyed. Agent Vallee said the victim had incoming calls after 6:48 but that they did not register to the network. Agent Vallee identified an aerial photograph, which he said showed a cellular tower less than seven-tenths of one mile from the victim's house. Agent Vallee said Myron Fleming's cell phone

-21-

data indicated Myron Fleming's cell phone was in the same sector as the victim's house from 4:53 until 6:25 p.m. Agent Vallee said the Defendant's and Myron Fleming's cell phones were connected for a call at 6:49 p.m., with the records showing Myron Fleming was in the area where the victim's truck was recovered. Agent Vallee said Myron Fleming's cell phone was moving on Highway 231 North during a call between 7:11 and 7:12 p.m. Agent Vallee said Myron Fleming's cell phone was used for a call from 7:29 to 7:36 p.m. Agent Vallee said the location of Mr. Fleming's cell phone corresponded with the cellular towers in the area of Capital Bank on Cason Lane, where video surveillance footage existed of the Defendant's having used an ATM. Agent Vallee said the location of Mr. Fleming's cell phone corresponded with two cellular towers near Pinnacle Bank on Cason Lane from 11:10 until 11:33 p.m. and that it corresponded with the surveillance video footage of the Defendant using a Pinnacle Bank ATM from 11:19 until 11:20 p.m. Agent Vallee said Mr. Fleming's cell phone activity from 11:23 to 11:57 p.m. placed him in the area of Ms. Fleming's house, and he agreed this corresponded with video footage evidence showing him at Ms. Fleming's house at 11:30 p.m. Agent Vallee agreed that a person's location would not be shown on a cellular network if they were not using their device at the time.

Agent Vallee testified that Myron Fleming's Sprint cell phone began showing cellular activity on December 3, 2016 in the Atlanta, Georgia area at 10:37 a.m. and that it continued in Atlanta until December 4 at 9:24 p.m. Agent Vallee said Myron Fleming's cell phone began showing cellular activity on December 4, 2016 at 9:21 p.m. in Central Florida, which continued through December 8, when Myron Fleming was arrested in Wildwood, Florida.[2] Agent Vallee did not think Myron Fleming and the Defendant had any cellular activity between their devices from December 3 through December 8, 2016.

Agent Vallee testified that the Defendant's Verizon Wireless records were subpoenaed but that they showed no activity on December 2, 2016, despite showing activity on other dates. Agent Vallee said, however, that Myron Fleming's cellular activity showed a call between his cell phone and the Defendant's cell phone on December 2, despite the lack of activity shown on the Defendant's Verizon records. Agent Vallee said he concluded that because the Defendant's cell phone was a Tracphone, it had used another network on December 2. Agent Vallee said that by the time he became involved in the case, the time had elapsed for obtaining cellular data for the Defendant's cell phone number from other cellular providers. He said records were only maintained for one year. Agent Vallee said he had not analyzed the Defendant's cell phone device to determine if any tracking data existed regarding the Defendant's location during the relevant time period.

---

[2] We acknowledge that the time Mr. Fleming was in Georgia and the time he was in Florida overlap by three minutes. We have stated Agent Vallee's testimony as it was given.

John Paul Rowe testified that Chasity Smith was his girlfriend. He said that in 2015 or 2016, he had "rented a place" from "Ms. A" on Highway 231 between Shelbyville and Murfreesboro. He said he met the victim in 2012 when they worked together on a construction project. He said the victim had been an electrician and that Mr. Rowe had done "demo work." Mr. Rowe said he and the victim had become friends, that they would "hang out" and fish together. Mr. Rowe said the victim "worked and went home" and "didn't really bother anybody." Mr. Rowe said the victim lived in Murfreesboro when they met. Mr. Rowe said he and Ms. Smith lived at the victim's Murfreesboro house for about six months in approximately 2014. Mr. Rowe said the victim eventually sold the house and moved to a house on Highway 231 in Shelbyville.

Mr. Rowe testified that, at the time of the victim's death, the victim drove a Chevrolet Silverado truck and had a light brown pit bull dog that was about one year old. Referring to a previously admitted photograph exhibit, Mr. Rowe identified the victim's truck. Mr. Rowe said Ms. Smith drove the victim to and from work and to other places the victim needed to go after the victim "got a DUI or something." Mr. Rowe said that the victim paid Ms. Smith $10 per hour and that Ms. Smith had been driving the victim for a week or two before the victim's death. Mr. Rowe said Ms. Smith did not have keys to the truck. Mr. Rowe agreed that he had driven the victim for errands a few times and denied that he drove the victim to a bank.

Mr. Rowe testified that he was on probation for possession of a weapon by a convicted felon and aggravated assault. When asked about his other criminal history, Mr. Rowe said, "I've got some driving on suspended licenses. . . . I had a rape charge. I've had . . . possession of marijuana, I got convicted of that. There's been several." He agreed he may have forgotten additional offenses. He agreed that he had been sober since completing a rehabilitation program four months ago. He said that he had been working as a machinist for the past four or five months.

Mr. Rowe testified that he and Ms. Smith lived in a hotel in December 2016 and that he was using drugs at the time. He said that he had recently been released from jail and that he had no money and no place to go. He said that the victim lived with the victim's dog but that no other person lived with the victim in December 2016. Mr. Rowe said the victim had a safe against a wall between the kitchen and living room. Mr. Rowe said that when he lived with the victim in Murfreesboro, the victim kept medical records, a nine-millimeter handgun, an SKS rifle, a twenty-two caliber pistol, bullets, and documents related to the house in the safe, but Mr. Rowe did not know the contents of the safe after the victim moved to Shelbyville.

Mr. Rowe testified that, after the victim sold the Murfreesboro house, the victim came to see Mr. Rowe and offered to give him money to help him "settle down and get

[his] life together." Mr. Rowe said the victim also bought a motorcycle for $5000 after selling the Murfreesboro house.

Mr. Rowe testified that he met Myron Fleming in jail in 2013. Mr. Rowe said he, the victim, and Myron Fleming spent time together in Mr. Rowe's hotel room. Mr. Rowe said the three of them were together "down here in Bedford County" once or twice. Mr. Rowe said they used drugs and drank beer together. Mr. Rowe said that, at the time, Myron Fleming was staying with Myron Fleming's aunt in Murfreesboro. Mr. Rowe said he met the Defendant about one month before the victim's death. Mr. Rowe said he had been friends with Myron Fleming but that the Defendant "was around" but that the two of them did not spend time together. Mr. Rowe identified Myron Fleming's girlfriend as Autumn Slade. Mr. Rowe said Myron Fleming and the Defendant spent time with the victim when Mr. Rowe was not around. Mr. Rowe identified the victim's girlfriend as Amber and thought her last name was Abrahams. Mr. Rowe agreed that he thought she was a "bad influence" on the victim. Mr. Rowe described Samantha McBride as "another person that was around" and denied he had been in a relationship with her. He thought he had been around her twice and said he met her through Myron Fleming. He agreed he introduced the victim and Myron Fleming and said he did not find out "until later" that the victim and Myron Fleming had been "hanging out." Mr. Rowe agreed he had "heard" Myron Fleming went to the victim's house. He agreed he told the victim not to "hang out" with the Defendant and Myron Fleming without Mr. Rowe's being present based upon something Ms. Smith told him that the Defendant had said.

Mr. Rowe testified that he knew in November or December that Myron Fleming had the victim's ladder. Mr. Rowe said that he had offered to pick up the ladder at Ms. Fleming's house but that he did not because the victim had wanted to retrieve the ladder himself. Mr. Rowe said Ms. Smith went with the victim to pick up the ladder.

Mr. Rowe testified that on December 2, 2016, Ms. Smith had driven the victim to work in the victim's truck that morning. Mr. Rowe said he was at the hotel when Ms. Smith came home around 4:00 p.m. Mr. Rowe said that after Ms. Smith arrived at the hotel, the victim left in the truck. Mr. Rowe said the victim did not come inside to see him, which was unusual. Mr. Rowe explained that the victim normally came inside to talk, drink beer, or smoke a cigarette.

Mr. Rowe testified that he called the victim because he had expected but had not received a call from the victim. Mr. Rowe said the victim did not answer. Mr. Rowe said that he called a couple of hours later but that the victim's cell phone was turned off. Mr. Rowe said he had never known the victim to turn off his cell phone.

-24-

Mr. Rowe testified that he learned about the victim's death when TBI agents came to the hotel. He agreed that no one had promised him anything in exchange for his testimony.

Mr. Rowe testified that he had not been at the victim's house on the night of November 27 and the early morning hours of November 28, 2016.

Mr. Rowe acknowledged that he, the victim, and Ms. Smith used methamphetamine together. Mr. Rowe agreed that methamphetamine was their "drug of choice" but that they also used heroin and pills. Mr. Rowe agreed that he and the victim had disagreements but said they never had any physical altercations.

Chasity Smith testified that she had known the victim since 2013 and that she met him through Mr. Rowe. She agreed she and Mr. Rowe had lived with the victim in Murfreesboro. She said the victim had bragged about making money from the sale of a house. She agreed she had been concerned that the victim was "a little too obvious about his money."

Ms. Smith testified that she had not liked Myron Fleming. She said that she met the Defendant through Mr. Rowe but that she did not "hang out" with the Defendant. She said she knew Autumn Slade as Myron Fleming's girlfriend. She said that the victim was "with" Amber Abrahams but that she did not like Ms. Abrahams because "she was using him" because he had money. Ms. Smith said she did not meet Ms. Abrahams "until right at the end."

Ms. Smith testified that the victim, Myron Fleming, the Defendant, Ms. Abrahams, and Samantha McBride came to the hotel room to "party." She said she and Mr. Rowe did not want to do this because they had "changed." She said the victim gave Mr. Rowe and her $40 and the victim's truck key for Mr. Rowe to take Ms. Smith to get something to eat. When asked who paid for the drugs, she said, "Tim probably," referring to the victim.

Ms. Smith testified that she saw the victim almost daily in the last week of his life because she was driving him to and from work. She said the routine when she drove the victim to work was for her to drive the victim's truck from the hotel to the victim's house to pick him up and to take him to his worksite in Donelson. She said that she sat in the truck while he worked and that they went back to Shelbyville around 3:00 to 3:30 p.m. She said she dropped off the victim at his house and drove the truck to the hotel. She said she was paid $100 per day.

Ms. Smith agreed that in the week of the victim's death, Mr. Rowe received a call from the victim and that she overheard the call because Mr. Rowe used a speakerphone.

-25-

She agreed the victim had been upset about something that happened the previous night. She said the call had come at night. She agreed she took the victim to work the next day.

Ms. Smith testified that the victim had a safe in his house between the kitchen and the living room. She said it was visible from the front door. She had never seen inside the safe and did not know its contents.

Ms. Smith testified that on December 1, 2016, she picked up the victim and took him to a medical appointment, to a fast food restaurant, and to his worksite. She said that she waited while he worked and that on the way home, they stopped at Ms. Fleming's house to get the victim's ladder. She said that, based upon the previous phone conversation, she did not think getting the ladder was a good idea. She said she called Mr. Rowe about the matter. She said that she voiced her concerns to the victim but that he insisted. She said that when they arrived at Ms. Fleming's house, Myron Fleming and Ms. Slade sat in the green Honda. She said Myron Fleming got out and talked to the victim. Ms. Smith said she went inside to use the restroom, with Myron Fleming walking her inside to the restroom. She said the Defendant came out of the restroom and that the Defendant asked if she had heard that the Defendant "pulled a gun on" the victim to get the victim to open the safe. She said she responded that she knew about it and that it "wasn't funny." She said the Defendant laughed about the incident. She agreed the Defendant had said the victim did not open the safe. She said that when she returned outside, the victim and Myron Fleming had loaded the ladder and that she and the victim left.

Ms. Smith testified that on December 2, 2016, she drove to the victim's house and waited while he paid bills. She said they left around 10:00 or 11:00 a.m. to go to his worksite. She said that after the victim finished work, they stopped at a bank in Donelson. She said she did not go inside with the victim. She said she did not know the nature of the business the victim transacted at the bank. She said they stopped at a store for the victim to purchase gas, cigarettes, and beer. She said they went to the hotel, rather than to the victim's house, because the victim needed his truck over the weekend. She said that she went inside the hotel and that the victim left. She said that she had asked the victim to call Mr. Rowe and her to let them know he arrived home safely but that the victim never called. She said both she and Mr. Rowe tried to call the victim that night and on Saturday. She said the calls were directed immediately to voice mail. She agreed they did not have a car to drive to check on the victim. She said they learned what happened to the victim from the TBI on December 4. She said she never saw or heard from the Defendant and Myron Fleming after she had seen them at Ms. Fleming's house on December 1.

Amber Abrahams testified that she was on probation for shoplifting and that she had not been promised anything in exchange for her testimony. She said she met the victim through "Aaron," whose last name she did not know. She thought she and the victim met around July 4, 2016, and said they dated. She said that the victim lived in Murfreesboro at

the time and that she stayed at his house "a little" but did not live there. She said he had a pit bull named Justice. She said the victim sold his house in Murfreesboro. She knew the victim used Pinnacle Bank. She said he had a large safe in his house in Murfreesboro and later in his Bedford County house. She said he kept pain medication and firearms inside the safe and thought he kept documents in it, as well. She thought the safe contained at least one shotgun. She said she did not know how to open the safe.

Ms. Abrahams testified that she stayed frequently at the victim's Bedford County house. She acknowledged that she and the victim used crack cocaine together. She said the victim had security cameras on his front porch that displayed activity on the porch on a laptop or computer screen. She did not know if the cameras were visible if a person approached the porch from outside. She did not know about any cameras inside the house.

Ms. Abrahams testified that she met the Defendant after the victim sold his house. She said the victim rented a hotel room in Murfreesboro "to have a good time" using drugs and invited "some friends who had some friends." She said she had a "really bad feeling" about the people. She said she met the Defendant this night. She thought she also met Myron Fleming this night. She said she never spent time with the Defendant or Myron Fleming unless the victim was present and said the Defendant and Myron Fleming were not her friends. She said the Defendant was going to tattoo an image of the victim's deceased twins' names on the victim's chest. She said that she and the victim spent time with Mr. Rowe and Ms. Smith but that Ms. Abrahams refused to be around his other friends after meeting them at the Murfreesboro hotel.

Ms. Abrahams testified that the victim's best friend, other than his dog, was Mr. Rowe. She said she never spent time with Mr. Rowe and Ms. Smith unless the victim was also present.

Ms. Abrahams testified that she was in jail on the night of the victim's death. She thought she was in jail for a drug-related matter. She said she had been in jail for "a couple of nights" and that she ultimately served seven months. She said she learned of the victim's death when TBI officers took her from her cell and talked to her in an investigator's office.

Ms. Abrahams testified that she and the victim "weren't committed" but were dating. She said she had recently "been with" Quincy Tizdale but that Mr. Tizdale had not been her boyfriend. She agreed Mr. Tizdale and the victim did not like each other.

Samantha McBride testified that she met the Defendant through Myron Fleming, who she "kinda" dated after meeting him through social media in Summer 2016. She said she and Myron Fleming used interavenous methamphetamine and heroin together. She said Myron Fleming and the Defendant lived at their aunt's house in Murfreesboro. She

said that Myron Fleming had a car but that the Defendant did not. She identified a previously admitted photograph exhibit as depicting Myron Fleming's car.

Ms. McBride testified that she met the Defendant shortly after the Defendant was released from jail. She said they met at a hotel in Murfreesboro and that Autumn Slade, who was Myron Fleming's girlfriend, was also present. She said she also met the victim, who was the Defendant's boss. She said the group used drugs together that night.

Ms. McBride testified that she, Myron Fleming, Autumn Slade, and the Defendant went to the victim's house one night to "hang out." She said that there was discussion of a tattoo but that she did not "think it ever happened." She said that, at some point, Myron Fleming and Ms. Slade left. Ms. McBride said that after they left, the victim thought she stole $50 from him and that she, the victim, and the Defendant argued. She said that she did not take the $50 and that she defended herself against the allegation. She said that she went outside onto the porch and that she noticed a camera on the porch. She said that while she sat on the porch smoking, the victim and the Defendant argued about the $50 and the victim's debit card, which was also missing. She said she had not taken the debit card. She said that Myron Fleming and Ms. Slade returned to pick her up and that Myron Fleming intervened when he saw the Defendant and the victim arguing. She said that by this point, the Defendant had pulled a shotgun on the victim. She said the Defendant pointed the shotgun at the victim's head and demanded the combination to the safe and the PIN for the debit card. She said that she had gone inside to retrieve her belongings and that she saw the Defendant pointing the shotgun at the victim. She agreed that the victim refused to open the safe. She said the argument ended when Myron Fleming entered the house, pulled the Defendant away, and told the Defendant to get in the car. She agreed that the victim tried to leave, that Myron Fleming's car was "blocking him in," and that he returned to the house. She said that when she, the Defendant, Myron Fleming, and Ms. Slade were in the car, the Defendant was mad at Myron Fleming and stated "[t]hat he didn't have his back." Ms. McBride said that when they left, the victim also left. Ms. McBride said she, the Defendant, Myron Fleming, and Ms. Slade went to Ms. Fleming's house. Ms. McBride said Ms. Slade and Myron Fleming left Ms. Fleming's house to buy drugs with the "50 that went missing . . . plus a little more."

Ms. McBride testified that Myron Fleming and the Defendant liked to wear Nike Jordan shoes.

Jereisse Fleming testified that she had a four-camera security system in her home in Murfreesboro in 2016. She said one faced the front door and one was in the garage. She said she had stored several rolls of duct tape in different colors in her garage, and she identified a photograph of the rolls of duct tape that had been in her garage. She said law enforcement came to her house on December 5, 2016, and took all of her duct tape rolls.

When asked about a roll of "neon green duct tape," she said she thought that her tape had been darker green but that the roll might be hers.

Ms. Fleming testified that the Defendant and Myron Fleming were her nephews. She agreed they lived with her in December 2016. She said Myron Fleming lived with her off and on for several years. She said the Defendant moved into her house in June or July 2016. She said that both nephews had come from Georgia and that both had nowhere else to go. She agreed she tried to help them "get on their feet and get established." She said that they were supposed to pay rent after a couple of months but that they did not. She agreed that the Defendant had worked odd jobs for money but said Myron Fleming had not been working. She agreed that she expected them to abide by her household rules, which included their not having company when she was out of the house and not having overnight guests. She agreed that in November 2016, she had given them two months, until January 2017, to move out.

Ms. Fleming testified that she met the victim at her house. She said the victim was outside with her nephews and their friends. She had understood that the Defendant was going to tattoo the victim. She said that the victim referred to the Defendant as "[h]is artist" and that the Defendant referred to the victim as "[h]is boss."

Ms. Fleming testified that earlier in the week the victim was killed, she came home from work and saw a "black thing" in a corner by the back door, which she said was "[l]ike a jacket" and which she was "pretty sure" had not been there when she left for work earlier. She said a shotgun lay underneath the jacket. She said the Defendant sat on the back porch talking on the telephone. She said she asked the Defendant about the shotgun and that the Defendant claimed Myron Fleming "said that it was another friend's or that another friend brought it and it was just being stored at my house because he wasn't able to get to . . . the end person." She said she had seen people she did not recognize in her house and that she questioned the Defendant and Myron Fleming. She said they stated the gun belonged to a friend of Myron Fleming. She acknowledged that her memory had been better when she gave a statement to law enforcement on December 5, 2016, in which she said the shotgun was "too short for a shotgun" and that it had black tape on it, but she did not recall at the time of the trial that the shotgun had black tape.

Ms. Fleming testified that while she was at work on December 1, 2016, she saw activity on her home security system involving people at her house. She said she sent Myron Fleming a text message to inquire "what it was about" and that he said a woman had to use the restroom and that the victim had picked up a ladder.

Ms. Fleming testified that at some point during the week of the victim's death, the Defendant told her that the victim had been upset about missing money and had blamed Ms. McBride. Ms. Fleming said that the Defendant was upset and could not believe the

victim did not trust him and that the Defendant repaid the victim with money the Defendant earned working for the victim. When asked if the Defendant "kept dwelling on it," she said, "A little bit for that day, yes."

Ms. Fleming testified that earlier in the week of the victim's death, she had talked to Myron Fleming about Ms. Slade's staying at Ms. Fleming's house and told him that Ms. Slade needed to find another place to stay. She said Myron Fleming was upset, asked Ms. Fleming to give Ms. Slade another chance, and stated that Ms. Slade had nowhere else to go.

Ms. Fleming testified that she worked on December 2, 2016. She said she saw via her security system that the Defendant left her house around 3:34 or 3:35 p.m. She said she did not see anyone else leave with the Defendant. She said that she arrived home around 6:56 p.m. and that no one was home when she arrived. She said Myron Fleming, Ms. Slade, and the Defendant arrived around 11:30 p.m. Ms. Fleming said her nephews and Ms. Slade made noise and were packing their belongings. She agreed that the Defendant was in a good mood and said he was "ready for a change and tired of the same old stuff." She said that she asked where they were going and that they said they were "going away for the weekend" to a destination north of Knoxville. She agreed that they packed belongings that might indicate a more lengthy trip. She said Myron Fleming moved his motorcycle from her garage onto her driveway and stated that his friend "Mike" was coming to get it to take it north of Knoxville.

Ms. Fleming testified that when she went out her garage door to walk her dog the next morning around 8:30 or 9:00 a.m., the Defendant, Myron Fleming, the motorcycle, and the green Honda were there. She said she was surprised because she thought her nephews had already left. She said she asked Myron Fleming to move the motorcycle to the garage because its being in the driveway was against her homeowners' association rules. She said that when she returned from her walk, the Honda, the Defendant, and Myron Fleming were gone.

Ms. Fleming testified that Myron Fleming notified her he had a new cell phone number. She thought this occurred on December 6, 2016. She said she did not see or hear from the Defendant and Myron Fleming until they were discovered in Florida.

Ms. Fleming testified that after the Defendant and Myron Fleming left her house, she found messages from the Defendant's Facebook Messenger account on her iPad. She agreed he had a December 3, 2016 message stating he had $2500, a car, and some guns. She agreed she allowed law enforcement to conduct forensic analysis of her iPad and two iPhones.

-30-

Jason Kennedy, a former Bedford County Sheriff's lieutenant, testified that he responded to the scene on December 2 or 3, 2016, where he assisted Agent Burkhart with the investigation. Mr. Kennedy said he collected evidence from Ms. Fleming's house on December 5, 2016. He said the evidence included a couple of rolls of duct tape, including one that was "fluorescent green" that matched tape at the crime scene. He identified a roll of duct tape as one that had been found in Ms. Fleming's garage, and the tape was received as an exhibit.

TBI Forensic Scientist Laura Boos, Ph.D., an expert in forensic biology, testified that she responded to the scene on December 3, 2016, as part of the Violent Crime Response Team. She agreed that she collected samples from reddish brown stains at the scene and that she analyzed evidence collected at the scene, from the victim's truck, from a green car searched in Florida, and from the Defendant's Air Jordan shoes.

Dr. Boos testified that she did not identify the Defendant's blood on any of the evidence containing blood that she examined. Regarding the evidence from the victim's house, she said that five stains from the porch, four stains on the siding, eight samples from a trail of reddish brown stains in the yard and gravel outside the house, the sheet from the front porch, and the camouflage jacket from the kitchen matched the victim's DNA profile. Two knives from the kitchen counter tested negative for the presence of blood. The knife with the broken tip tested positive for blood, but further testing proved inconclusive. Two cigarette lighters from the scene tested positive for blood, with one containing the victim's DNA profile and the other having an insufficient sample size for further testing. The gas can from the bedroom had blood on it that contained the profiles of two individuals, at least one of whom was male. A cigarette butt from the living room contained a DNA mixture from at least two individuals, with one being the victim's profile and the results being inconclusive for the other contributor. Other results from samples collected at the victim's house were inconclusive.

Dr. Boos testified that the victim's DNA profile was present in samples collected from the exterior of the victim's truck. Regarding results from samples collected inside the truck, Dr. Boos said the victim's DNA was present in two of the samples. She said that additional DNA profiles were present in some of the samples but that the results were inconclusive.

Regarding her examination of evidence from the green Honda recovered in Florida, Dr. Boos testified that "some" of the seven samples were positive for human blood and contained Myron Fleming's DNA profile. She said two samples from the front interior passenger door contained Ms. Slade's DNA profile. Three prescription slips for diazepam, Percocet, and Ambien were recovered from the Honda. Dr. Boos said that samples from all three prescription slips contained the victim's profile. She said that the diazepam prescription slip also contained Myron Fleming's DNA profile and that the Percocet

-31-

prescription slip contained a DNA mixture from another person in addition to the victim. Dr. Boos said that a sample from a cigarette found in the green Honda contained a DNA mixture from two people, one of whom was the Defendant, and that the result for the other profile was inconclusive.

Regarding her analysis of the Defendant's Air Jordan shoes, Dr. Boos testified that samples from both shoes contained human blood and that she was able to identify the Defendant's and Ms. Slade's DNA, but that additional results were inconclusive.

TBI Special Agent Forensic Scientist Supervisor Miranda Gaddes, an expert in microanalysis, testified that she responded to the scene on December 3, 2016, as part of the Violent Crime Response Team. She said that Agent Burkhart directed her to the shoe impressions in what appeared to be blood on the porch. She agreed that Dr. Boos' testing showed that the substance was blood. She said she photographed the shoe impressions and applied a chemical that reacted with blood to enhance detail of minute amounts of blood that otherwise would not be visible to the eye. She identified photographs of the shoe prints, which were received as exhibits. She said she recognized the prints as having been made by two different sizes of Nike Jordan shoes. She said she obtained fourteen shoe impressions from the porch, with ten impressions being a smaller size and four impressions being a larger size. She agreed that many different types of Nike Jordans existed and that the styles changed frequently.

Agent Gaddes testified that she examined a pair of size 10 Nike Jordan 1 Flight 4 shoes, which had previously been identified as belonging to the Defendant. Printouts of impressions Agent Gaddes made from the shoes were received as exhibits. She said that the model of shoes contained a distinctive star pattern that was hand stamped in the manufacturing process and resulted in a variation in the location of the stars on the shoes.

Agent Gaddes testified that of the ten smaller shoe impressions from the porch, seven were consistent with the Defendant's left shoe in size, shape, tread design, and wear. She said that one impression from the porch was consistent with the Defendant's right shoe in size, shape, tread design, and tread wear and that two impressions were "limited" in that they were consistent in size and tread design but did not provide enough information to determine if they were from the left or right shoe. She said that one impression from the porch contained sufficient "stippling" from the star pattern for comparison and that it matched the Defendant's left shoe. She said the impressions on the porch and the Defendant's shoes appeared to have "been made from the same mold." She said the model of Nike Air Jordan 1 Flight 4 shoes owned by the Defendant was manufactured from December 9, 2015 until March 1, 2016. She did not know how many pairs were manufactured or how many shoes were made from the mold used for the Defendant's shoes. She acknowledged that size 10 was a common size. She agreed that she had written in her report, "[T]he lack of individual characteristics [of the Defendant's shoes] precludes

a more conclusive comparison." A document representing a "shoe funnel," which depicted the levels of uniqueness of shoes, was received as an exhibit.

Agent Gaddes testified that a photograph exhibit, which had been previously identified as coming from the Defendant's Facebook account and depicting a Jordan shoe, did not appear to be the same as the Defendant's shoes that she examined.

Agent Gaddes testified that she collected evidence from the Chevrolet Silverado after it was brought to the TBI Laboratory. She said that she compared the zip ties from the victim's body and the ones from the truck and that she concluded the ones from the victim's body were not from the package in the truck.

Agent Gaddes testified that she examined duct tape from the victim's wrists and compared it with duct tape which was previously identified as having been collected from Ms. Fleming's garage. Agent Gaddes said the physical characteristics of the two samples were the same in that they were both 1-7/8" wide and had the same construction through a lamination process. She said the backing, adhesive, and number of warp and weft fibers were consistent. She concluded that the two samples came from the same manufacturer and noted that they were the same color. She said she could not attempt to match the tape from the victim's body to the roll from Ms. Fleming's garage due to the damaged condition of the tape recovered from the victim's body.

TBI Agent Randall Nelson, an expert in microanalysis, testified that he analyzed liquid from inside the gas can found at the scene and determined that it was gasoline. He said he analyzed a camouflage coat and the victim's jeans and determined that they contained evaporated gasoline. He said that he examined burned flooring materials collected from the back bedroom and that they did not contain any ignitable liquid residue, which he said did not eliminate the possibility that an ignitable liquid had been used because the liquid could have been completely consumed by the fire or could have been washed away during the fire extinguishing process.

TBI Special Agent Forensic Scientist Rachel Strandquist, an expert in forensic chemistry, testified that she responded to the scene as part of the Violent Crime Response Team and later conducted laboratory testing of a syringe that was submitted as evidence. She said the syringe contained cocaine residue.

Miguel Laboy, M.D., an expert in forensic pathology, testified that he performed the victim's autopsy. Dr. Laboy identified his autopsy report, which was received as an exhibit. Dr. Laboy said that the victim's clothing was partially burned, that the victim's hands were bound with partially burned green duct tape at the wrists, and that the legs were bound with green duct tape and a zip tie. Dr. Laboy said the victim had a "contact range" gunshot entrance wound to the back of the head, a gunshot exit wound to the area above

the right eyebrow, and a sharp force injury or cut to the neck. Dr. Laboy said that no bullet or bullet fragments were recovered during the autopsy and that he was unable to determine the caliber of bullet or type of weapon used. Dr. Laboy said the victim had soot on the back of his head, indicating that the gunshot had been fired "tight against or loose contact, close to the skin." Dr. Laboy said the neck wound was a stab wound with a one-inch incision that was two inches deep. Dr. Laboy said a person would still be able to move and talk after sustaining a neck wound of this nature. Dr. Laboy said the victim had a scrape and cut on the back of his left hand and two stab wounds to his lower extremities. Dr. Laboy said a stab wound to the front left thigh was 2-3/8" deep and that a stab wound to the right thigh was 1-7/8" deep. Dr. Laboy said the victim did not have a large amount of black deposit in his lungs, indicating that he had not been breathing during the fire.

Dr. Laboy testified that the victim's toxicology indicated the presence of ethanol, acetaminophen, nordiazepam, diazepam, cocaine metabolites, oxycodone, and noroxycodone. Dr. Laboy said the victim's blood contained 8% carbon monoxide. Dr. Laboy said the victim's blood-alcohol content was 0.07.

Dr. Laboy testified that a person who sustained a gunshot wound of the nature sustained by the victim might "last less than an hour or a little bit more without treatment" and that the injury was "lethal." Dr. Laboy said that a person could recover from a neck injury such as the one suffered by the victim, provided the person received medical treatment.

Dr. Laboy testified that, in his opinion, the victim's cause of death was gunshot wound to the head and sharp force injuries and that the manner of death was homicide. Dr. Laboy said the circumstance of death was assault by another or others.

The Defendant elected not to present evidence. After receiving the proof, the jury found the Defendant guilty of first degree premeditated murder, first degree felony murder; arson, and theft of property valued at $1000 or more but less than $10,000. The trial court merged the first degree murder convictions and imposed a life sentence. At a sentencing hearing, the court sentenced the Defendant to fifteen years for arson and to twelve years for theft, and the court imposed the arson and theft sentences concurrent to each other but consecutive to the life sentence, for an effective sentence of life plus fifteen years. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He argues that his identity as the perpetrator of the offenses was not sufficiently established

by the State's proof. Although the Defendant argues generally that the State failed to prove the elements of the offenses, he had not challenged that the crimes themselves occurred, and he has made no specific arguments as to any individual elements of the offenses other than to his identity as a perpetrator. The State counters that the evidence is sufficient to establish beyond a reasonable doubt that the Defendant committed the offenses. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1) (2018). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2019) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

First degree murder is also a "killing of another committed in the perpetration of or attempt to perpetrate arson [or] theft[.]" T.C.A. § 39-13-202(a)(2).

Relative to the offense of arson, "A person commits an offense who knowingly damages any structure by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein[.]" *Id.* § 39-14-301(a)(1) (2018) (subsequently amended).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a) (2018).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

A person is criminally responsible for an offense committed by the conduct of another, if:

. . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its

commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

The Defendant argues that none of the blood or latent print evidence placed him at the victim's house or where the victim's truck was recovered. The Defendant argues, as well, that although the evidence shows that he used the victim's ATM card shortly after the crime, the State did not establish that he participated in the crimes and that the evidence could support a conclusion that Myron Fleming committed the offenses and later took the Defendant to withdraw money from the victim's account.

As we have stated, a crime may be established solely by circumstantial evidence. *Reid*, 91 S.W.3d at 277. Viewed in the light most favorable to the State, the evidence shows that earlier in the week of the crimes, the Defendant held the victim at gunpoint in an attempt to force the victim to reveal the combination to the safe and the PIN for the victim's debit card. Shortly before his death, the victim went to his bank and transferred money to another account because he thought his account information had been compromised. The victim withdrew $2500 from his bank on the date of his death. The safe inside the victim's house was found unlocked, and its contents were in disarray. The victim was known to keep guns and medication inside the safe. The contents of the victim's house were in disarray. Bright green duct tape of the same type found at Ms. Fleming's house, where the Defendant lived, was used on the victim's bindings. The Defendant changed clothes four times during an approximate six-hour period surrounding the victim's death. The victim's dog was found with the victim's truck, which had flat tires. Security footage showed the Defendant leaving Ms. Fleming's house in Myron Fleming's green Honda around 3:35 p.m. on December 2, and security footage at TJ Maxx and Target stores showed the Defendant with Myron Fleming shortly thereafter. Mr. Cox's daughter saw two men in a green Honda parked near the victim's house shortly before she heard a gunshot and before the fire erupted at the victim's house. Ms. Fleming testified that the Defendant did not return to her house until around 11:30 p.m. that night, which was after security footage showed the Defendant attempting to make ATM withdrawals with the victim's debit card. The Defendant, Myron Fleming, and Ms. Slade left town within hours of the crimes, fleeing to Florida, where they were eventually apprehended and were found in possession of the victim's prescription slips with the victim's blood on them. The Defendant boasted in a Facebook message on the day after the crimes, "So I got $2,500, a legit car, my brother, a couple of firearms, and a few bags clothes [sic]. I just crossed the GA line. We are on 75 South, I'm ready to get on with my life." When the Defendant was arrested in Florida, he had healing injuries on his hands, which would support an inference that he was involved in the crimes. In addition, shoe prints which matched the Defendant's size 10 Nike Air Jordan 1 Flight 4 shoes were found in the victim's blood on the victim's porch.

From the evidence, a rational jury could conclude that the Defendant and Myron Fleming waited outside the victim's house, eventually entered the house, shot the victim in the back of the head, stabbed the victim in the neck and lower extremities, and bound his hands and feet with duct tape and zip ties. The Defendant and Myron Fleming stole the $2500 the victim had withdrawn from the bank earlier that day, the victim's prescription slips, and the victim's guns. The Defendant and Myron Fleming doused the victim's house with gasoline and set fire to it in an attempt to destroy evidence of their crimes. The Defendant and Myron Fleming stole the victim's truck and abandoned it in another location, which a rational jury could conclude was done without the victim's consent.

Upon review, we conclude that the evidence of the Defendant's identity as a perpetrator of the crimes, whether by direct conduct or via criminal responsibility for Myron Fleming's conduct, is sufficient to support the convictions for first degree murder, arson, and theft. The Defendant is not entitled to relief on this basis.

## II

### Sentencing

The Defendant contends that the record does not support the trial court's imposition of partial consecutive sentencing. The State counters that the Defendant has not shown an abuse of discretion by the trial court. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as

there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014) (subsequently amended); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was received as an exhibit and reflected the following: The twenty-nine-year-old Defendant had prior convictions for two counts of "R.I.C.O. offenses," tampering with evidence, theft of property, and felony marijuana possession. He had juvenile adjudications for two counts of marijuana possession, driving under the influence, and five counts of automobile burglary. He had violated the terms of release on two occasions and had been ordered to serve his sentences for those cases. Detailed biographical information about the Defendant was limited because he had not completed the personal questionnaire provided by the presentence investigation officer. The Strong-R Assessment "result[ed] in a score of High for Violence." The Strong-R Assessment noted that the Defendant had not completed high school, indicated he might have a mental health issue, acted impulsively, viewed crime as "useful," had been motivated in criminal activity by "excitement, amusement, or fun," has had a drug problem during his lifetime, and did not have a history of steady employment.

A victim impact statement completed by Ms. Vail-Allman and members of the victim's family were received as exhibits.

Certified copies of the Defendant's prior convictions from Cobb County, Georgia, and a probation revocation order were received as exhibits. Certified copies of the Defendant's prior Rutherford County, Tennessee, convictions and a probation violation report were received as an exhibit.

Jeriesse Fleming testified that the Defendant was a "sweet kid" who had a "good upbringing." She said he had a "heart of gold" and wanted to change his ways after being caught up in a lifestyle to which he was not accustomed. She said the Defendant had tried to change his ways when he had lived with her and that the Defendant's brother and others had been bad influences. Ms. Fleming asked the judge to extend mercy to the Defendant.

Ms. Fleming acknowledged that she had asked the Defendant to move out of her house before the crimes and that he had not been following her household rules.

The Defendant provided the following allocution: He thought about the victim, with whom he had had a good relationship. He prayed nightly for the victim and the victim's family. He did not kill the victim and was convicted based upon a criminal responsibility theory. The victim's killer was "still . . . out on the streets." The case was not over, and the Defendant "will be back."

The trial court found that the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish he was a Range III offender. *See* T.C.A. § 40-35-114(1) (2014) (subsequently amended). The court also found that before trial or sentencing, the Defendant failed to comply with the conditions of release in the community. *See id.* at (8). The court found, as well, that the Defendant was on release from Georgia convictions at the time he committed the present offenses. *See id.* at (13). The court found, relative to the theft conviction, that the Defendant's conduct neither caused nor threatened serious bodily injury. *See id.* § 40-35-113(1) (2019). Upon consideration of the evidence and the statutory factors, the court sentenced the Defendant to maximum sentences for Range III of fifteen years for arson and twelve years for theft.

The Defendant has not challenged the length of the sentences imposed for arson and theft. Our review leads us to conclude that the trial court did not abuse its discretion in imposing the fifteen-year sentence for arson. As a matter of plain error, however, we note an impropriety in the Defendant's theft sentence. As we have stated, the offenses occurred on December 2, 2016. At that time, the theft statute provided that theft of $1000 or more but less than $10,000 was a Class D felony. *See id.* § 39-14-105(a)(3) (2014) (subsequently amended). Effective January 1, 2017, theft of $1000 or less became a Class A misdemeanor; theft of more than $1000 but less than $2500 became a Class E felony; and theft of $2500 or more but less than $10,000 became a Class D felony. *See id.* (a) (1)-(3) (2018). The indictment, which was returned on August 21, 2017, charged the Defendant with theft of property valued at $2500 or more but less than $10,000. Later, the State moved to amend the indictment to allege the amount of the theft was "more than one thousand dollars ($1,000) but less than ten thousand ($10,000) dollars." The court filed an order permitting the amendment on November 19, 2018. The jury's verdict form reflects that it found the Defendant guilty of theft and that it specified the value of the property stolen to be "at least $1,000 in value but less than $10,000." In *State v. Menke*, 590 S.W.3d 455, 470 (Tenn. 2019), our supreme court held that Tennessee Code Annotated section 39-11-112 (Criminal Savings Statute) applied to the amendments to the grading of theft, even where the offense occurred before the effective date of the amendments but the defendant was sentenced after the effective date. As applied to the facts of the present case, *Menke* compels us to conclude that the trial court abused its discretion in sentencing the Defendant

-40-

for Class D felony theft. The jury found the Defendant guilty of theft of property valued at $1000 or more but less than $10,000. Pursuant to Code section 39-14-105(a)(1) as it existed at the time of sentencing, the offense was a Class A misdemeanor. *See Menke*, 590 S.W.3d at 465-66. The sentence for a Class A misdemeanor is eleven months, twenty-nine days. T.C.A. § 40-35-111(e)(1) (2019). We modify the Defendant's theft sentence to eleven months, twenty-nine days, to be served at 75%.

Regarding consecutive sentencing, the court found that the Defendant had an extensive record of criminal activity. *See id.* § 40-35-115(2). The court found that this factor was sufficient to justify consecutive sentencing and imposed the arson and theft convictions concurrent with each other but consecutive to the Defendant's life sentence, for an effective sentence of life plus fifteen years.

On appeal, the Defendant argues that consecutive sentencing is not supported by the facts of the case and that the sentence he received furthers prison overcrowding and taxes the resources of the Department of Correction. The Defendant does not contend that the trial court erred in its application of enhancement and mitigating factors or in its classification of him as a Range III offender. Likewise, he does not argue that the trial court erred in finding that he was an offender with an extensive record of criminal activity pursuant to Code section 40-35-115(2).

Upon review, we conclude that the Defendant has not shown that the trial court abused its discretion in imposing partially consecutive sentences. The Defendant's criminal record is abysmal. The record supports the trial court's determination that he was an offender with an extensive record of criminal activity, which is an appropriate statutory basis for consecutive sentencing. *See id.* The trial court determined, within its discretion, that a sentence of life plus fifteen years was no greater than the Defendant deserved for the offenses and was the least severe measure necessary. *See id.* § 40-35-103(2), (4); *Desirey*, 909 S.W.2d at 33. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the first degree murder and arson judgments of the trial court are affirmed. The theft conviction is affirmed, and the sentence is modified to eleven months, twenty-nine days, to be served at 75%.

_____
ROBERT H. MONTGOMERY, JR., JUDGE